The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Jan N. Pittman, and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the Opinion and Award, except for those portions concerning plaintiff's Motion for Attorney's Fees pursuant to G.S. § 97-88.1.
Before the Full Commission, defendant made an oral Motion to Admit Additional Evidence, consisting of correspondence between the parties' attorneys. After careful consideration, defendant has failed to show good ground in support of its Motion to Admit Additional Evidence and said Motion is therefore, DENIED.
All objections raised during the depositions of Drs. James and Naso are ruled upon in accordance with the law and the Opinion and Award rendered in this matter.
* * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties prior to the hearing before former Deputy Commissioner Pittman, along with a Pre-Trial Agreement which is incorporated herein by reference, as:
STIPULATIONS
1. Plaintiff's average weekly wage during the relevant period was $375.00 per week resulting in a compensation rate of $250.00 per week;
2. That at the time of plaintiff's claim, defendant maintained a sickness and accident insurance plan pursuant to which plaintiff received 43.5 weeks of sickness and accident benefits in the amount of $126.00 per week during the period in which she was out of work after mid-June of 1990 due to her alleged compensable illnesses or injury, and that if plaintiff's claim is found to be compensable, that defendant would be entitled to a credit for said payments; and
3. That the nursing notes regarding plaintiff kept by defendant be received into evidence at the time of the hearing as Stipulated Exhibit One. However, in this regard, while two pages of medical records were received into evidence at the time of the hearing as Stipulated Exhibit One, six pages of nursing notes were submitted with plaintiff's Contentions in this matter, and as the Pre-Trial Agreement of which the undersigned took judicial notice, indicates that said nursing records were stipulated to, the undersigned received said additional stipulated records into the record following the hearing as Stipulated Exhibit Two.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing on 8 June 1995, plaintiff, a high school graduate, was thirty-five years of age. Plaintiff was employed with defendant on 8 June 1995 as a Material Salvage Handler, a position different from her duties at the time of her alleged compensable injury or illness.
2. Plaintiff began working with defendant in 1988. In May of 1990 she was working as a Tire Builder in defendant's Tire Room. Plaintiff normally worked what was termed the "fourth shift", which ran from midnight Friday night until noon Saturday, and from midnight Saturday until noon Sunday. In addition to her normal twenty-four hour weekly employment, she was also "filling in" as a Tire Builder to cover other employees who were out of work for miscellaneous reasons. Such "fill-in" work was spread throughout the work week.
3. At the time that plaintiff first reported problems with her right hand, she was building approximately 330 to 350 tires per twelve-hour shift. Each tire building would start with plaintiff striking a green button with the heel of her right hand. Plaintiff was required to use a "hot knife" to cut several components of each tire. She would grip the "hot knife" tightly in her right hand and cut from right to left. She would make such cuts for the rubber inner lining, the first plystock, and the second plystock for each tire, or roughly approximately 1,000 such cutting motions per shift. Further, plaintiff would have to peel two rubber "beads" about 14 to 15 inches in diameter from plastic shells for each of the 330 to 350 tires per shift. She would have to make an up and down peeling motion about six times for each of the two beats per tire, or about 4000 such peeling motions per shift. Plaintiff was also required for each tire to use a roller to mate the ends of the two rubber pads together. She would hold the roller in her right hand and press firmly with the roller to adhere the ends of the two rubber pads. She made about three such rolling motions for each of two sides per tire, or roughly 2,000 rolling motions per shift. Also, at the time plaintiff began experiencing right wrist pain symptoms and hand numbness, the tires plaintiff was building would stick to the drum which required her to use the palms of both hands three to six times per tire to beat loose each tire from the drum.
4. On or about 3 May 1990, plaintiff's right wrist began to hurt her considerably during her work shift and she reported her pain to her supervisor. Plaintiff then went to defendant's Medical Station. The Medical Station nursing notes for that date indicate that plaintiff had a "painful right wrist" and an ace wrap bandage was applied. The nursing notes indicate that plaintiff had similar complaints on nursing station visits on 5 May 1990; 11 May 1990; and 20 May 1990; and was either wrapped on those dates and/or given anti-inflammatory medication. Plaintiff testified that she had other visits to the Medical Station in May and June in which she was treated with ice for swelling in her right wrist and had her right wrist wrapped.
5. On or about 21 June 1990, plaintiff saw her family physician, Dr. Holt, for her complaints. On 22 June 1990, she telephoned defendant's head nurse, Ms. Wall, and advised Ms. Wall that Dr. Holt had placed her on light duty with a diagnosis of tendonitis. Dr. Holt referred plaintiff to an orthopedist, Dr. James of Rock Hill, South Carolina.
6. Plaintiff first saw Dr. James on 27 June 1990 with complaints of right wrist pain which had started in May of 1990 with repetitive type motion from tire building. Dr. James' diagnosis of plaintiff's May 1990 problems was initially DeQuervain's Disease of the right wrist, a tendonitis of the tendons across the wrist joint. After three months of conservative treatment and following a markedly positive Finkelstein's Test for DeQuervain's Disease, Dr. James performed a right wrist DeQuervain's Release on 5 October 1990. He concluded that plaintiff's job duties involving repetitive motion were more likely than not the cause of her DeQuervain's symptoms. Dr. James assigned plaintiff a twenty-five percent permanent partial impairment to her right thumb as a result of her DeQuervain's Disease and the resultant surgery.
7. As a result of her DeQuervain's Disease, plaintiff left her employment with defendant on or about 18 June 1990. She returned to her job as a Tire Builder on 19 April 1991. As noted, the parties stipulated that she was out of work 43.5 weeks during this period and received sickness and accident benefits during this time.
8. On 7 December 1991 and 8 December 1991, plaintiff again presented at defendant's medical station with complaints of a swollen and painful right wrist. She complained of pain since she had returned to work three weeks before in November 1991. Plaintiff was treated with a wrist wrap and anti-inflammatory medications. On 9 February 1992, she reported to the Medical Station with a painful right wrist stating that she had been bumping sticking tires from her machine, and using dull scissors to cut tire inner liners. Plaintiff's hand was soaked in hot water and she was again given anti-inflammatory medication.
9. On 11 February 1992, plaintiff returned to Dr. James complaining of right hand numbness. Dr. James' impression was work-related carpal tunnel syndrome. Dr. James treated plaintiff conservatively from February 1992 to July 1992. He referred plaintiff for EMG nerve conduction studies which were indicative of carpal tunnel syndrome. His notes indicate that plaintiff was taken out of work for her carpal tunnel syndrome on 25 June 1992. On 28 July 1992, Dr. James scheduled plaintiff for a carpal tunnel release on plaintiff's right wrist. Plaintiff was released from Dr. James' care in mid-October of 1992, and defendant's Medical Station notes for 20 October 1992 indicate that plaintiff returned to work on 25 October 1992. As a result of her carpal tunnel syndrome, plaintiff was out of work from 28 June 1992 until 25 October 1992. Plaintiff has sustained no permanent partial disability to her right wrist as a result of said condition, and continues as of the date of the hearing to be employed by defendant.
10. Dr. James has opined that plaintiff's DeQuervain's Disease and carpal tunnel syndrome were brought on by repetitive motion from her job duties.
11. At the request of defendant, plaintiff was seen by Dr. Naso, an orthopedist specializing in hand surgery, on one occasion on 15 June 1992. Following his examination, Dr. Naso concluded that plaintiff had mild carpal tunnel syndrome which was unrelated to plaintiff's employment with defendant.
12. At the hearing on 8 June 1995, defendant called an ergonomic specialist, David J. Dixon, Ph.D., who prepared a report of 19 May 1995 following a visit on 12 May 1995 to defendant's plant where he observed a tire building machine, as well as the making of a videotape of a female worker at the video machine. Also, black and white photographs of the aforementioned female worker were attached to his report. However, the opinion of Dr. Dixon is based on incorrect assumptions regarding plaintiff's job duties and medical history, such as: assuming that plaintiff did not fill-in during the regular work week for absent employees, assuming that plaintiff was the same body height and weight of the female worker in the video tape; assuming that plaintiff had refused treatment from defendant's medical department; and assuming an incorrect number of tires plaintiff built in a shift.
13. When considering the totality of the evidence of record, the undersigned affords greater weight to the opinion of plaintiff's treating physician, Dr. James, regarding plaintiff's conditions of DeQuervain's Disease and carpal tunnel syndrome, and finds that plaintiff's employment with defendant placed her at an increased risk of developing DeQuervain's Disease, as well as carpal tunnel syndrome, than the public generally. The undersigned further finds that the repetitive nature of plaintiff's job duties as a Tire Builder was a significant contributing or causative factor in the development of her DeQuervain's Disease and carpal tunnel syndrome.
14. Defendant's actions in the defense of this claim, including the appeal to the Full Commission, were reasonable and not borne out of unfounded litigiousness.
* * * * * * * * * * *
Based upon the foregoing and findings of fact the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff has contracted DeQuervain's Disease and carpal tunnel syndrome of the upper right extremity, occupational diseases which are due to causes and conditions characteristic of her employment with defendant as a Tire Builder which are not ordinary diseases of life to which the general public is equally exposed outside of said employment. G.S. § 97-53.
2. As a result of plaintiff's DeQuervain's Disease, plaintiff was temporarily totally disabled for the period beginning 18 June 1990 and continuing until 19 April 1991, and is entitled to temporary total disability compensation benefits at the rate of $250 per week for said period, subject to a credit awarded defendant for sickness and accident benefits paid to plaintiff during that period. G.S. § 97-29.
3. As a result of plaintiff's carpal tunnel syndrome, plaintiff was temporarily totally disabled from on or about 28 June 1992 and continuing through 24 October 1992, and is entitled to temporary total disability compensation benefits at the rate of $250 per week for said period, subject to a credit awarded defendant for sickness and accident benefits paid plaintiff during that time. G.S. § 97-29.
4. As of 15 October 1991, plaintiff became entitled to compensation at the rate of $250.00 per week for 18.5 weeks for the twenty-five percent permanent partial impairment she sustained to her right thumb. G.S. § 97-31 (1).
5. Plaintiff is entitled to have defendant pay for all reasonable medical treatment arising from these two occupational diseases. G.S. § 97-25.
6. Plaintiff is not entitled to attorney's fees pursuant to G.S. § 97-88.1 as defendant's actions in the defense of this claim were reasonable, including the appeal to the Full Commission, and not borne out of unfounded litigiousness.
* * * * * * * * * * *
AWARD
1. Defendants shall pay compensation benefits to plaintiff at the rate of $250.00 per week from 18 June 1990 up to and including 18 April 1991 for her temporary total disability, subject to a credit awarded defendant for sickness and accident benefits previously paid to plaintiff during said period, and also subject to a reasonable attorney's fee hereinafter approved. This compensation has accrued and shall be paid in a lump sum.
2. Defendants shall pay compensation benefits to plaintiff at the rate of $250.00 per week from 28 June 1992 up to and including 24 October 1992 for her temporary total disability subject to a credit awarded defendants for sickness and accident benefits paid to plaintiff during said period, and also subject to a reasonable attorney's fee hereinafter approved. This compensation has likewise accrued and shall be paid in a lump sum.
3. Defendants shall pay compensation benefits to plaintiff at the rate of $250.00 per week for 18.75 weeks for her permanent partial disability. This compensation has accrued and shall be paid in lump sum subject to a reasonable attorney's fee hereinafter approved.
4. Defendants shall pay all medical expenses incurred by plaintiff as a result of the aforementioned occupational diseases.
5. A reasonable attorney's fee in the amount of twenty-five percent of the compensation awarded herein is hereby approved for plaintiff's counsel, and said fee shall be directly paid to counsel for plaintiff.
6. Defendant's actions in the defense of this claim were reasonable, including the appeal to the Full Commission, and not borne out of unfounded litigiousness. Therefore, plaintiff's Motion for additional attorney's fees pursuant to G.S. § 97-88.1
is DENIED.
7. Defendants shall pay expert witness fees in the amounts of $200.00 to Dr. Naso, and $225.00 to David Dixon, Ph.D.
8. Defendants shall pay the costs.
 S/ ___________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _______________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _______________________ BERNADINE S. BALLANCE COMMISSIONER